**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mark J. Schwartz, | ) No. CIV-01-2075-PHX-MHM |
| | ) |
| Plaintiff, | ) **ORDER** |
| | ) |
| vs. | ) |
| | ) |
| Metropolitan Life Insurance Company, a) | |
| New York corporation; American Express) | |
| Long Term Disability (LTD) Benefit Plan,) | |
| | ) |
| Defendants. | ) |
| | ) |

Plaintiff has asserted a claim for disability benefits under an employee welfare benefit plan governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq.  Defendants are Metropolitan Life Insurance Company ("MetLife") and American Express Long Term Disability Benefit Plan.  This case is before the Court following remand from the Court of Appeals for the Ninth Circuit.  The Ninth Circuit reversed and remanded with instructions to apply a de novo standard of review.  (Doc. 53).

Plaintiff has filed a motion for summary judgment (Doc. 61) supported by a separate statement of facts.  (Doc. 26).  Defendants have filed a cross-motion for summary judgment (Doc. 60)  supported by a separate statement of facts (Doc. 20).  The parties have filed appropriate responses and replies.  (Doc. 37, 62-64, 67).

# I.

## **Background Facts**.

A. <u>Relevant Plan Provisions</u>.

Plaintiff was a participant in the American Express Employee Benefits Plan (the "Plan") which provided long-term disability ("LTD") coverage through a group disability insurance policy purchased from MetLife.  The Plan is governed by ERISA.  Pursuant to the terms of the Plan, a person who is enrolled in the LTD Benefit Plan and who has been totally disabled and prevented from working for six consecutive months is eligible to apply for monthly LTD benefits following that six-month period.

The Plan provides "own occupation" coverage for the first 24 months that benefits are payable and states in part as follows:

> You are considered totally disabled and eligible to apply for LTD Benefit Plan benefits if, during the six-month waiting period and the first two years that benefits are payable, you are unable to perform any and every duty of your own occupation due to a medically determined physical or mental impairment caused by sickness, disease, injury or pregnancy.  You must require the regular care and attendance of a doctor.

After the first two years, coverage is provided under the "any occupation" standard and the Plan provision relevant to this coverage provides as follows:

> To receive benefits after the first two years that benefits are payable, you must be under the care and attendance of a licensed physician and your disability must prevent you from engaging in each of the material duties of any gainful work or service for which you are reasonably qualified, taking into consideration your training, education, experience and past earnings (except rehabilitative employment).

The Plan provides that if a person becomes totally disabled before age 60, benefits will continue as long as the person is totally disabled, up to age 65 "(unless [the person] [is] disabled due to mental illness, as defined ...") in another section of the Plan. The Plan provides limited coverage for disability due to mental illness as follows:

> If you are disabled due to mental illness, benefits are limited to 24 months if treatment is rendered on an outpatient basis ... If you do not return to work at the end of the 24-month period ... your LTD coverage will end. Mental illness is defined as a mental, emotional or nervous condition of any kind.

The Plan's provisions set forth the procedures for filing claims and review of claims for benefits, including an appeal if a claim is denied. In addition, "[T]he plan administrator has the exclusive right to interpret the provisions of the plan and its decision is final, conclusive and binding (except as otherwise provided in the plan or by law)." With respect to proof of any claim, the Plan provides:

> The claims administrator reserves the right to require verification of any alleged fact or assertion pertaining to any claim for benefits. For example, as part of the basis for determining health care benefits, the claims administrator may require submission of medical summaries, discharge reports, X-rays or other appropriate materials.

Plaintiff has provided evidence, based on deposition testimony of Defendants' official Laura Sullivan, that if a disability involves a combination of physical and mental conditions, MetLife's initial assessment focuses on whether the person is disabled overall. If the Plan contains a 24-month limitation for mental/nervous conditions, such as the Plan at issue in this case, MetLife continues to investigate to determine whether both conditions are disabling or the nature of the actual cause of the condition. Ms. Sullivan further testified that if the claimant is disabled by both mental and physical conditions, though neither alone is disabling, benefits are payable beyond the 24-month period as stated in the Plan for "mental illness." Plaintiff further has provided information through the testimony of MetLife's employees and officials that MetLife's case managers and appeal specialists do not have any medical training except in general medical terminology.

B.    Plaintiff's condition and application for benefits.

Plaintiff is an accountant with a history of hypertension (high blood pressure), high cholesterol, and coronary artery disease ("CAD"). On January 30, 1999, at the age of 51, Plaintiff underwent four-vessel coronary artery bypass surgery. On February 17, 1999, Dr. Andrei Damian, Plaintiff's cardiologist, noted that Plaintiff had done "well" regarding his surgery and was discharged with an "excellent post surgical recovery." Dr. Damian noted that stress and anxiety experienced at work had contributed to Plaintiff's cardiac condition and he was initially scheduled to return to work on a part-time "trial" basis. Dr. Damian also

- 3 -

referred Plaintiff to a hospital-based cardiac rehabilitation program.  It was noted in this rehabilitation plan that Plaintiff has a family history of early onset heart problems.  The plan focused on stress reduction as a rehabilitation goal.

On March 11, 1999, Plaintiff's internist, Dr. Jack Poles, noted that Plaintiff's blood pressure and general examination were "unremarkable."  A treadmill stress test on March 17, 1999, had  "normal results", with no subjective or objective evidence of coronary artery disease, no arrhythmias and excellent exercise capacity.

However, shortly after surgery, Plaintiff began to experience exaggerated psychological anxiety.  On April 14, 1999, Plaintiff had his first appointment with Dr. David Boyer, a psychiatrist, who diagnosed him as suffering "post bypass anxiety syndrome." Plaintiff was released to return to work based on his physical recovery and returned to work part-time on April 15, 1999. In a Rehabilitation Services Report dated April 15, 1999, Plaintiff's physical therapist indicated that Plaintiff has said that stress was a contributing factor.

On June 14, 1999, a nurse's note indicated that Plaintiff had reported that his blood pressure had become elevated and fluctuated and he experienced dizziness, palpitations, chest pain and fatigue.

On June 16, 1999, Dr. Poles reported that Plaintiff had been having a difficult time with returning to work and that he lacked energy.  Dr. Poles determined that Plaintiff needed to be on total disability.  Plaintiff ceased working permanently on June 16, 1999.  On June 17, 1999, Dr. Poles wrote in a letter to Dr. Damian that Plaintiff's EKG was "unremarkable" and that he suspected Plaintiff's condition was "more stress related." Dr. Poles noted that Plaintiff's blood pressure was high. Dr. Poles recommended "total disability", reporting to Plaintiff's employer that Plaintiff  was unable to perform his job and that this condition would continue "indefinitely."

On June 18, 1999, Dr. Damian's progress note indicated that Plaintiff was "struggling" with anxiety and depression.  Dr. Damian stated that he believed that "part of his symptoms are related to intermittent hypertension up to 150/102." In June 1999,

1   Plaintiff's Holter Monitor results (a 24-hour test that monitored Plaintiff's heart rate)

2   revealed underlying sinus rhythm with normal heart rate variability.

3   On June 25, 1999, Dr. Damian wrote to Dr. Poles that with medical management

4   Plaintiff's blood pressure had remained down.  However, Dr. Damian noted "documented

5   clear evidence of hypertension and a blood pressure of 151/102."  Dr. Damian expressed

6   concern about the development of Plaintiff's post bypass graft depression and anxiety, noting

7   that Plaintiff was currently undergoing psychotherapy.  Dr. Damian did not believe Plaintiff

8   could return to work.  A 24-hour Holter monitor had not revealed any evidence of malignant

9   dysrhythmia.  On June 30, 1999, Dr. Damian reported to Plaintiff's employer that Plaintiff

10  suffered from depression, stress intolerance and labile hypertension related to anxiety, and

11  that he was unable to interact effectively with clients.

12  On July 15, 1999, Plaintiff's Nuclear Stress Test revealed an EKG portion with

13  excellent exercise capacity and heart rate attainment.  There was no suggestion of ischemia

14  and the gated wall motion analysis revealed normal left ventricular function. On July 27,

15  1999, Dr. Damian reported that Plaintiff had excellent exercise capacity and documented an

16  excellent anatomical recovery but that stress and related symptoms including post bypass

17  anxiety prevented him from returning to routine employment.  On September 16, 1999, Dr.

18  Poles reported that Plaintiff's symptoms seemed under control because he was not working

19  and that his physicians had concluded that he could not again work in his usual capacity

20  because of his reaction to job stress.

21  On October 13, 1999, Plaintiff complained to Dr. Damian of nonspecific chest

22  discomfort that did not appear cardiac in description.  Dr. Damian reported an abnormal

23  finding that Plaintiff's blood pressure was 180/120; however, there was no evidence of

24  congestive heart failure or cardiac gallop.  It was noted that Plaintiff was unable to deal

25  appropriately with stressful situations without putting himself at risk.  On this same date, Dr.

26  Damian reported to the Social Security Administration that Plaintiff had "wonderful

27  improvement" following his heart treatment but he did not believe that Plaintiff could return

28  to a gainful employment, noting that Plaintiff is "affected negatively by any interaction with

1  humanity, stress, or responsible work and accountability which will only compromise his life
2  span." Dr. Damian wrote that Plaintiff had "developed significant anxiety post bypass
3  surgery which is consistent with post bypass stress and anxiety syndrome which appears
4  exacerbated continually with the severe presence of hypertension."

5        On October 14, 1999, MetLife wrote Plaintiff advising that he might be eligible for
6  LTD benefits and requested completion of a number of forms which were enclosed. On
7  October 25, 1999, Plaintiff completed a Statement of Claim requesting LTD benefits under
8  the Policy.

9        On October 29, 1999, Dr. Poles reported that Plaintiff "clearly cannot perform at work
10  due to severe anxiety ..." On October 31, 1999, Dr. Poles completed an Attending Physician
11  Statement and Physical Capacities Evaluation for MetLife, stating that Plaintiff suffered from
12  coronary disease, anxiety, chest pain, sweats and palpitations. Dr. Polies indicated that
13  Plaintiff's "problems are anxiety related not due to physical limitations. ..."

14        Dr. Boyer's November 13, 1999 Attending Physician Statement stated that Plaintiff's
15  psychological functions were at a Class 3-4 (marked limitation) due to "emotional factors
16  affecting a medical condition-anxiety and depression" and "obsessive compulsive personality
17  disorder." Dr. Boyer stated that Plaintiff's acute anxiety and depression were expected to
18  abate, but not his underlying psychophysiologic vulnerability,  e.g., significant blood
19  pressure increases under stress.  Dr. Damian's November 17, 1999 Attending Physician
20  Statement stated that Plaintiff's Psychological Functions were a Class 4 (marked limitations),
21  but that his Cardiac Functions were only a Class 2 (slight limitations).  Dr. Damian stated
22  that Plaintiff suffered from severe post bypass anxiety syndrome and hypertension and he
23  was unable to engage in gainful activity. On November 22, 1999, MetLife wrote to Dr.
24  Damian requesting Plaintiff's medical records.

25        On December 5-7, 1999, Plaintiff was self-admitted to the hospital for chest pain but
26  no cardiac problem was found.  Hospital records noted a "status of post bypass graft surgery
27  with significant symptoms mostly related to post stress anxiety and evidence of hypertension
28

1   which remain[ed] out of control until most recently when [Plaintiff] was placed on
2   continuous beta blockade."  A treadmill Cardiolite documented excellent exercise capacity.
3   Dr. Damian's office visit  note for December 27, 1999 stated that control of Plaintiff's blood
4   pressure had been achieved and Plaintiff did not appear to be under significant stress at that
5   time.

6        In a January 12, 2000 letter, Dr. Damian responded to Provident Insurance Company
7   regarding an Independent Medical Exam performed by Dr. Michael Greer. Dr. Damian's
8   response stated that "[w]hile the objective stress treadmill data suggest an adequate surgical
9   result and presumes no limitations preventing a return to work ....In my opinion it is clear that
10  Mr. Schwartz's disability at this point is caused by his post bypass anxiety syndrome and
11  secondary intermittent uncontrolled hypertension which is acutely exacerbated by his attempt
12  to return to work..." On January 22, 2001, Plaintiff received a Social Security total disability
13  award commencing July 1999 with primary diagnosis of "anxiety related disorder" and
14  secondary diagnosis of "personality disorder."

15       MetLife had Plaintiff's file reviewed by Dr. Jay Lasser, its consulting psychiatrist.
16  Dr. Lasser noted that Plaintiff wanted to return to work but his perfectionist tendencies and
17  entrenched personality issues were unlikely amenable to much change. Dr. Lasser
18  recommended that Plaintiff's file be reviewed by a consultant with expertise in cardiology.
19  Plaintiff claims that MetLife did not have a cardiologist review his file.

20       On February 17, 2000, a MetLife official reviewed Plaintiff's claim as a high liability
21  claim. The information on the review form indicated that Plaintiff's diagnosis was
22  "cardiovascular disease, anxiety, depression" and stated that "because of significant anxiety
23  disorder and personality components it is highly unlikely [Plaintiff] will improve enough to
24  return to any occupation."

25       On February 25, 2000, MetLife informed Plaintiff that his LTD claim had been
26  approved as a mental/nervous condition starting July 29, 1999 (the end of the six-month
27  elimination period) and that he was eligible to receive Plan benefits for 24 months, through
28  July 29, 2001, if he remained disabled.  Plaintiff was re-notified of this information on April

1   28, 2000 and May 15, 2000. On February 28, 2000, MetLife requested all of Plaintiff's

2   medical records from Dr. Damian.

3          On March 22, 2000, Dr. Damian wrote Dr. Poles that Plaintiff had recently blacked

4   out and he possibly was experiencing orthostatic changes. Dr. Damian recommended concern

5   over possible transitory bradycardia or a heart block. Dr. Damian was not concerned with

6   hypertension at the present time.   On March 29, 2000, Dr. Damian wrote Dr. Poles that a 24

7   hour Holter monitor documented a sinus rhythm with a first degree AV block and absence

8   of any significant periods of bradyarrhythmias. A change in medication had resulted in

9   Plaintiff's improved condition, noting that he was essentially asymptomatic.

10          Dr. Poles' Attending Physician Statement dated May 28, 2000 stated that Plaintiff had

11   "anxiety related symptoms not physically impaired." Plaintiff's diagnoses were listed as

12   including coronary disease, hypertension, anxiety at work, chest pain, sweats, and

13   palpitations.   Dr. Poles noted that Plaintiff could not deal with stressful situations. Dr.

14   Damian's May 31, 2000 Attending Physician Statement discussed Plaintiff's coronary artery

15   disease, hypertension and inability to engage in stress situations or interpersonal

16   relationships. Dr. Boyer completed an Attending Physician Statement and supplemental

17   questionnaire on June 1, 2000 which indicated that Plaintiff "is unable to cope with the stress

18   of his career" and that he is unable to return to work.

19          On June 10, 2000, Plaintiff completed an Activities of Daily Living form in which he

20   stated that stressful situations caused an increase in his blood pressure and that he had trouble

21   concentrating.  Plaintiff stated he had had to scale back his volunteer work.

22          In June 2000,  Dr. Damian wrote that Plaintiff's blood pressure was well controlled

23   "in the absence of any active excitement." Dr. Boyer noted that Plaintiff had increased blood

24   pressure as a result of an incident when he misplaced his volunteer badge at the hospital.  In

25   September 2000, Dr. Damian reported that even with minimal stress and anxiety, Plaintiff

26   was experiencing significant hypertension, and that a recent discussion concerning his

27   financial circumstances caused his blood pressure to become elevated.

28

1      On November 1, 2000, Dr. Poles reported that Plaintiff is "doing well from the

2   cardiovascular point of view except that he gets occasional stress-induced chest pain which

3   [Plaintiff] does not think is cardiac." Dr. Poles stated that Plaintiff suffered from chest pain,

4   difficulty breathing, and hypertension when under stress due to such things as financial

5   concerns.

6      On November 2, 2000, Plaintiff was admitted to the hospital for chest pain.

7   Examination revealed no active disease in the chest. A stress test revealed excellent

8   functional capacity, mild hypertensive response to exercise, and normal ST segment response

9   to exercise. A cardiac ultrasound revealed trivial mitral and tricuspid regurgitation and an

10   otherwise unremarkable 2-d, M-mode and Doppler examination.

11      Dr. Damian's December 10, 2000 chart note stated that Plaintiff's catheterization

12   revealed that his disease had progressed to the point of "total occlusion of the LAD [left

13   anterior  descending  artery]  with  no  flow  via  the  graft  in  that  distribution."

14   On January 11, 2001, Dr. Damian wrote Dr. Poles that Plaintiff had "evidence of progression

15   of cardiac disease with angina induced by stress and anxiety and difficulty in documenting

16   objectively the presence of active cardiac disease with a treadmill stress test."

17      On January 11, 2001, MetLife notified Plaintiff that benefits under the mental/nervous

18   provision would be paid to July 29, 2001. MetLife requested any information that supported

19   a physical condition that would prevent Plaintiff from working at any occupation.

20      Plaintiff provided MetLife with Dr. Damian's letter dated January 22, 2001 stating that

21   Plaintiff had "developed symptoms of exertional angina and chest discomfort associated with

22   hypertension" which was mostly associated "with periods of anxiety, stress and anger related

23   to his communications with the insurance company regarding his disability policy." Dr.

24   Damian wrote that  "[i]t is clear that any work related interaction, stress, or anxiety does

25   cause [Plaintiff] profound symptoms and elevated blood pressure which are known to cause

26   plaque rupture, vasoconstriction, and progression of disease." Dr. Damian indicated that a

27   recent catheterization had documented the progression of aggressive cardiac disease as

28   described in the letter. Dr. Damian expressed the opinion that Plaintiff was at "a very high

1   risk" for progression of disease and he should be on total disability while attempting to
2   control such progression.

3          In a February 20, 2001 office note, Dr. Damian reported that Plaintiff had some
4   "atypical episodes of chest pain which are probably musculoskeletal ... without any evidence
5   of congestive heart failure."

6          Plaintiff's pre-termination of benefits appeal was received by MetLife on February
7   26, 2001.  In March 2001, MetLife requested additional information/medical records  from
8   Dr. Damian and from two of Plaintiff's medical providers.

9          On March 20, 2001, Dr. Damian reported that Plaintiff had presented with atypical
10  chest pain, mostly on the right side associated with stress and anxiety related to his father's
11  illness.  Dr. Damian did not believe that Plaintiff was exhibiting the presence of new
12  progressive coronary artery disease. On March 29, 2001 Plaintiff underwent a Nuclear Stress
13  Test at Dr. Damian's office.  The test revealed normal cardiac function and excellent exercise
14  capacity. Dr. Damian's April 2, 2001 office visit note reported that the 24-hour Holter
15  monitor test was unremarkable, with excellent exercise capacity and absence of myocardial
16  ischemia. On April 9, 2001, Dr. Damian wrote Dr. Poles that Plaintiff continues to have
17  atypical but persistent chest discomfort and that there was evidence of residual LAD disease.
18  Dr. Damian recommended a PTCA/stent. On April 19, 2001, Plaintiff underwent an
19  angioplasty and stent surgery.

20         On April 12, 2001, MetLife referred Plaintiff's medical records for a Physician
21  Consultant Review by Amy Hopkins, M.D., MPH, Ph.D. (Board Certified in Internal
22  Medicine and Occupational Medicine, Fellow of the American College of Occupational and
23  Environmental Medicine).  Dr. Hopkins reviewed the medical records of Drs. Poles, Damian
24  and Boyer.  Dr. Hopkins expressed the opinion that Plaintiff had developed a host of
25  psychological problems following his heart surgery in January 1999 but that his blood
26  pressure recordings since early 2000 had been within normal limits.  Plaintiff's cholesterol
27  and two stress tests also were within normal limits.  However, a recent cardiac [catheter] had
28  shown progression of disease "which is to be expected."  Dr. Hopkins noted that Plaintiff has

had atypical chest pain which has not been documented to be of cardiac origin and that Plaintiff's daily exercise included walking, swimming and golfing.  Dr. Hopkins also noted that Dr. Poles does not feel that Plaintiff had significant limitation and that Plaintiff had not worked since April 1999 so it could not be presumed that working per se would increase his blood pressure.  Dr. Hopkins found no documented indication of a "cause and effect" relationship between Plaintiff's working and elevated blood pressure, noting that Plaintiff's blood pressure had been well controlled since starting a beta blocker and he had not attempted work since starting his current medication regimen.

Dr. Hopkins mentioned that Plaintiff's stress at work increased his cholesterol but "no such relationship between stress and cholesterol levels has been documented in the medical literature" and that "stress does not cause, exacerbate, or accelerate [coronary artery disease]."  Dr. Hopkins noted that Plaintiff had held leadership  and committee roles in various organizations, performed volunteer work and functioned adequately outside the home. Dr. Poles also had recommended that Plaintiff was capable of performing at a medium work capacity physically. Dr. Hopkins' final recommendation was that no physical impairments had been documented which preluded Plaintiff from returning to work full time as to any occupation up to and including medium work capacity.

Plaintiff contends that Dr. Hopkins' findings that his blood pressure readings and other tests since early 2000 had been normal were erroneous because she did not have all of his medical records.  According to Plaintiff, in the summer and fall of 2000 he had experienced high blood pressure and his November 2000 cardiac catheterization revealed new arterial blockage.

On April 19, 2001, MetLife wrote Drs. Poles and Damian advising that Plaintiff was being paid LTD benefits under a mental/nervous contractual provision which expired on July 29, 2001. MetLife included Dr. Hopkins' findings and stated that Drs. Poles and Damian were being afforded an opportunity to comment.

On April 23, 2001, Dr. Poles responded to MetLife regarding Dr. Hopkins' evaluation. Dr. Poles stated that, although Dr. Hopkins' evaluation of Plaintiff's physical

1 problems was correct, Plaintiff could not psychologically return to his previous occupation
2 and that attempts at doing so would precipitate chest pain, anxiety, and total dysfunctionality.
3 Dr. Poles stated that Plaintiff had residual disease in his left anterior descending artery of at
4 least 60 to 70 percent.

5      On May 10, 2001, Plaintiff advised MetLife that he had undergone an angioplasty and
6 stent surgery on April 19, 2001. During Plaintiff's May 15, 2001 office visit, Dr. Damian
7 noted that Plaintiff had had a stent/angioplasty and had "remained free of symptoms since
8 the procedure [had been] performed."

9      On July 9, 2001, Dr. Damian wrote to MetLife in response to Dr. Hopkins' review,
10 stating that he did not totally disagree with Dr. Poles who had indicated that Plaintiff was
11 capable of performing at a medium work capacity physically.  Dr. Damian stated that the
12 problem was not necessarily Plaintiff's physical condition but his mental condition and his
13 mental ability to deal with the requirements at work, stress, anxiety, and all in perspective
14 of what had occurred after his unexpected bypass surgery and progression of disease.  Dr.
15 Damian reported that Dr. Hopkins was incorrect in her assessment that "progression of
16 cardiac disease can be expected" after bypass surgery. Rather, in his opinion, progression is
17 generally not expected within the first year or two following bypass surgery in patients as
18 young as Plaintiff.  Dr. Damian noted that Plaintiff's chest pain had been documented to be
19 of cardiac origin because it had subsided after the angioplasty and stent replacement.

20      On July 18, 2001, MetLife advised Plaintiff that it had reaffirmed the determination
21 that his disability was a mental/nervous condition and that benefits would expire on July 29,
22 2001.  MetLife explained that Dr. Boyer had provided documentation which supported a
23 mental condition and therefore benefits had been paid on that condition.  The letter further
24 explained that Plaintiff's doctors and MetLife's independent physician consultant had
25 seemed to agree that while Plaintiff has a cardiac condition, it did not physically restrict or
26 limit Plaintiff's function as to preclude his ability to return to his former occupation or other
27 occupation up to a medium level of work capacity.  Plaintiff was advised of his appeal rights
28 in this letter.

On July 19, 2001, Plaintiff submitted a letter from Dr. Damian dated July 18, 2001 to MetLife. Dr. Damian stated in this letter that, post bypass graft surgery, Plaintiff had been documented to have progressive symptoms of depression and anxiety consistent with well-established syndrome. Plaintiff's physical and emotional conditions were jointly contributing to his progressive cardiac disease and inability to control Plaintiff's blood pressure had been documented. Dr. Damian opined that Plaintiff was disabled from working in his own profession or any other profession involving stressful conditions and that if Plaintiff disregarded his doctors' recommendations not to work, he faced "reasonably certain untimely demise." Dr. Damian observed that anxiety and emotional stress had been documented in the medical literature since 1994 as a trigger causing disruption of plaque and progressive occlusive disease. According to Dr. Damian, returning Plaintiff to his working environment in his profession or any occupation involving stress would start a "cascade of uncontrolled events that [would] culminate in uncontrolled hypertension as proven before, secondary and related anxiety and significant disruption of the plaque with fatal outcome."

On July 20, 2001, Plaintiff requested another appeal and MetLife referred the claim to Dr. Hopkins for review. Dr. Hopkins conducted a second Physician Consultant Review on August 2, 2001. Dr. Hopkins found that Dr. Damian had not provided any additional information substantiating that Plaintiff had a physical impairment that would prevent him from working in any occupation. Dr. Damian further had indicated that the primary problem was Plaintiff's psychological problems. Dr. Hopkins concluded that no physical impairments had been documented that would preclude Plaintiff from returning to work full time in any occupation up to and including a medium work capacity.

On August 3, 2001, Plaintiff's file was referred to MetLife's Appeals Department. On September 12, 2001, Plaintiff's attorney provided additional medical records from Plaintiff's primary doctors plus records related to Plaintiff's April 19, 2001 hospitalization for angioplasty and stent surgery. The file and additional medical records were sent to Dr. Hopkins for another review. On September 28, 2001, Dr. Hopkins concluded that Plaintiff

was not precluded by documented physical impairments from returning to work full time up to and including medium work capacity, stating as follows:

> [Plaintiff] has had atypical [chest pain] of long-standing duration, but it has not been documented to be of cardiac origin. He has not had any CHF [chronic heart failure], significant arrhythmias, or ongoing ischemia. [Plaintiff's] documented [blood pressures] in the additional information provided were all [within normal limits], so Dr. Damian's contention that [Plaintiff] has uncontrolled [hypertension] is simply not supported by his own records. It is not clear why he would be refuting his own [blood pressure] measurements. While [Plaintiff] may have progressive [coronary artery disease], he does not have any [symptoms] referable to the cardiac system, and there is no documented cardiac reason why he cannot [return to work] in any occupation at up to a medium level work capacity, at least ... [Plaintiff] clearly had problems w/ stress and anxiety ... It is not clear why, if Dr. Damian feels that stress is such a potentially lethal problem in [Plaintiff's] life, he has not referred [Plaintiff] to some kind of stress management program.... The determination of impairment is based upon an individual's current condition, not on what might or might not potentially happen in future situations. While [Plaintiff's] anxiety might be impairing him from certain kinds of work, that cannot be construed as implying that his cardiac condition would worsen if he returned to work ... No physical impairments have been documented which preclude [Plaintiff] from [return to work], [full time], any occupation, at up to and including a medium work capacity.

On October 10, 2001, MetLife wrote to Plaintiff's attorney explaining that the decision had been upheld on appeal. MetLife stated that "[a]fter [Plaintiff's] bypass surgery, Dr. Damian and Dr. Boyer indicated that [Plaintiff] regained the physical capacity to perform sedentary work, but was disabled from his own occupation as a result of a mental health condition." The reviewer concluded that Plaintiff was not physically disabled as of July 29, 2001 from performing sedentary-like duties of his own occupation and that there was no "objective information" in the record showing that "exposure to work stress represents a severe threat to [Plaintiff's] physical health." The letter stated that "in determining disability, we base our decision on an individual's current functionality rather than what could potentially happen in the future." On October 10, 2001, MetLife informed Plaintiff's employer that review of Plaintiff's appeal had been completed and that the decision to terminate benefits had been upheld.

## II.

### **Standard of Review on Summary Judgment**.

A motion for summary judgment may be granted only if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). To defeat the motion, the non-moving party must show that there are genuine factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986). The party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e). See also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1356 (1986).

## III.

### **Discussion**.

Plaintiff contends that benefits were wrongfully terminated on July 29, 2001 based on the following arguments: (1) the "mental illness" language of the type used in the Plan cannot be applied to cases involving mental conditions resulting from physical disorders; (2) he suffers from both aggressive coronary artery disease and maladaptive personality patterns and therefore benefits are payable for a physical, not mental, disability; (3) the Plan's disposition contravened its own interpretation that a claimant is not limited to 24 months of benefits if he is disabled by a combination of mental and physical ailments which is the case here. Plaintiff argues that in light of the undisputed documented evidence, he suffers from coronary artery disease and that he is disabled as a result of a rapidly deteriorating heart condition in conjunction with his physiologic reaction to job stress.

Defendants contend that based on the undisputed evidence provided by Plaintiff's treating physicians, but for Plaintiff's psychological conditions, i.e., bypass anxiety disorder, Plaintiff would not have any disabling symptoms. Defendants further contend that the evidence supported by the administrative record shows that Plaintiff has fully recovered from

1    his heart surgery, he suffers from a psychological condition, and therefore MetLife's

2    termination of benefits based on the mental/nervous limitation was proper.

3         This Court's review of Defendants' decision to terminate benefits is de novo. The

4    district court, in applying the de novo standard of review, must review de novo the plan

5    administrator's decision to deny benefits. Tremain v. Bell Industries, Inc., 196 F.3d 970, 978

6    (9th Cir. 1999).  Federal courts apply federal common law when faced with questions of

7    policy interpretation under ERISA. Padfield v. AIG Life Ins. Co., 290 F.3d 1121, 1125 (9th

8    Cir. 2002).  Under this federal common law, the terms of a plan are given their ordinary and

9    popular meaning as would a person of average intelligence and experience. Id.  A de novo

10   review "'gives no deference at all' to the decisions of insurers to deny benefits." Kearney v.

11   Standard Ins. Co., 175 F.3d 1084, 1090 n.2 (9th Cir. 1999).  Upon conducting de novo review,

12   the district court may decide the case on summary judgment if appropriate. Tremain, 196

13   F.3d at 978.

14        In order to receive LTD benefits under the Plan, a claimant must be "unable to

15   perform any and every duty of [the claimant's] own occupation due to a medically determined

16   physical or mental impairment caused by sickness, disease, [or] injury ..." The claimant also

17   must be under the regular care and attendance of a doctor.  The Plan further provides that if

18   a claimant is disabled due to "mental illness," benefits are limited to 24 months if treatment

19   is rendered on an outpatient basis.  The term "mental illness" is defined as "a mental,

20   emotional or nervous condition of any kind."  Evidence in the administrative record shows

21   that Plaintiff is under the regular care and attendance of his physicians following his coronary

22   artery bypass surgery in January 1999.  The parties do not appear to dispute a finding on this

23   issue in their briefing.

24        Based on Plaintiff's view of the medical evidence, Plaintiff has a history of

25   hypertension (high blood pressure), high cholesterol and coronary artery disease. In January

26   1999, at age of 51, he underwent four-vessel coronary artery bypass surgery.  Although his

27   prognosis for recovery was "excellent," shortly after surgery, Plaintiff began to experience

28   exaggerated anxiety resulting in a subsequent diagnosis of "post bypass anxiety syndrome"

1   in April 1999. Between April and June 1999, Plaintiff attempted to work at his own

2   occupation of accountant but it appears that stress related to his job was contributing to his

3   condition. In June, 1999, Plaintiff's physician Dr. Damian expressed the opinion that "part"

4   of Plaintiff's symptoms were related to intermittent hypertension. Plaintiff's hypertension was

5   documented about this same time. In November 1999, Dr. Damian noted that Plaintiff had

6   slight limitations regarding his cardiac functions, marked limitations with his psychological

7   functions and that he suffered from post-bypass anxiety syndrome and hypertension.  Dr.

8   Damian expressed the opinion that Plaintiff was unable to engage in gainful activity.  During

9   this same time, Dr. Boyer expressed the opinion that Plaintiff's acute anxiety and depression

10  might abate but not his underlying psychophysiologic vulnerability, that is, significant blood

11  pressure increases when under stress due to his cardiovascular condition.

12       A year later, in December 2000, Plaintiff's catheterization revealed that his coronary

13  artery disease/heart condition had progressed to the point of "total occlusion of the [left

14  anterior descending artery] with no flow via the graft in that distribution."  Dr. Damian's

15  January 2001 letter to Dr. Poles reported that Plaintiff had "evidence of progression of

16  cardiac disease with angina induced by stress and anxiety."  On January 22, 2001, Dr.

17  Damian wrote that Plaintiff had developed symptoms of exertional angina and chest

18  discomfort associated with hypertension which was mostly associated with periods of

19  anxiety, stress and anger.  Dr. Damian also wrote  that Plaintiff was at a "very high risk" for

20  progression of disease. In April 2001, Plaintiff underwent an angioplasty and stent surgery.

21  In July 2001, Dr. Damian disagreed with Dr. Hopkins and advised MetLife that Plaintiff's

22  progressive cardiac disease was not expected.  He also stated that Plaintiff's chest pain had

23  been documented to be of cardiac origin because it had subsided after the April 2001 stent

24  surgery.  According to Dr. Damian, Plaintiff's progression of cardiac disease with angina

25  induced by stress and anxiety had been difficult to detect with a treadmill stress test.

26       Plaintiff's treating physicians have expressed the opinion that Plaintiff is unable to

27  return to his own occupation or any profession and is totally disabled. In June and November

28  1999, Dr. Damian recommended Plaintiff's total disability. In January 2001, Dr. Damian

recommended to MetLife that Plaintiff should be on total disability while attempting to control the progression of his disease. In April 2001, Dr. Poles wrote to MetLife that Plaintiff could not psychologically return to his previous occupation and that attempts at doing so would precipitate chest pain, anxiety and total dysfunctionality. Dr. Poles noted that Plaintiff had residual disease in his left anterior descending artery of at least 60 to 70 percent. In a letter dated July 2001, Dr. Damian wrote to MetLife that Plaintiff had physical and emotional conditions that jointly were contributing to his progressive cardiac disease, again noting inability to control Plaintiff's hypertension. Dr. Damian opined that Plaintiff was disabled from working in his own profession or any other profession involving stressful conditions and that Plaintiff's return to work would endanger his health.

In contrast, Defendants have cited medical evidence of record which they claim indicates that Plaintiff does not have a physical condition that precludes his return to work. This medical evidence includes a treadmill stress test in March 1999 that revealed normal results, with no subjective or objective evidence of coronary artery disease. In April 1999, Dr. Boyer diagnosed Plaintiff as suffering from post bypass anxiety syndrome. In June 1999, Dr. Damian noted that Plaintiff was struggling with anxiety. An EKG in June 1999 was unremarkable. In October 1999, Dr. Poles informed MetLife that Plaintiff's problems were anxiety related not due to physical limitations. Dr. Poles expressed a similar opinion in May 2000. The record medical evidence contains several references to Plaintiff's excellent exercise capacity. There further were instances of chest pain that did not appear to be cardiac of origin. In January 2000, Dr. Damian wrote that the objective treadmill stress data suggested an adequate surgical result and presumed no limitation on Plaintiff's return to work. In April 2001, Dr. Hopkins in her first review of Plaintiff's medical records noted that Plaintiff had experienced atypical chest pain which had not been documented to be of cardiac origin and that Plaintiff's daily exercise included walking, swimming and golfing. Dr. Hopkins further noted that Dr. Poles had recommended that Plaintiff was capable of performing at a medium work capacity physically.

1    In July 2001, Dr. Damian wrote MetLife that he did not disagree with Dr. Poles who

2    had indicated that Plaintiff was capable of performing at a medium work capacity physically.

3    Dr. Damian stated that Plaintiff's problem was not necessarily his physical condition but his

4    mental condition and his mental ability to deal with the requirements of work, stress, anxiety,

5    in perspective of what had occurred after his bypass surgery and progression of disease.  In

6    Dr. Hopkins' second review in August 2001, she concluded that Plaintiff's physicians had not

7    provided any additional information that substantiated that Plaintiff had a physical

8    impairment that would prevent him from working in any occupation.  Even after Plaintiff

9    provided additional medical records, including records from his hospitalization for

10   angioplasty and stent surgery, Dr. Hopkins in September 2001 again concluded upon a third

11   review that Plaintiff was not precluded from documented physical impairments from

12   returning to work full time up to and including medium work capacity.  In this third review,

13   however, Dr. Hopkins recognized that Plaintiff "may have" progressive coronary artery

14   disease.  Dr. Hopkins further reported that Plaintiff had no symptoms referable to the cardiac

15   system and that there was "no documented cardiac reason" why Plaintiff cannot return to

16   work.

17   The issue is whether Plaintiff suffers from a condition, or a combination of

18   conditions, and whether, as a result, Plaintiff is disabled in the sense defined by the Plan.

19   Evidence such as that provided from Plaintiff's physicians, including Dr. Damian, could

20   justify the trier of fact in concluding that Plaintiff's heart condition or coronary bypass

21   surgery caused his exaggerated mental condition; or, that Plaintiff suffers from a combination

22   of impairments, and that he is unable to work and is disabled.  On the other hand, such

23   evidence as that provided by Dr. Hopkins could justify the trier of fact in concluding that

24   Plaintiff's mental condition, that is, his exaggerated anxiety, has rendered him unable to work

25   but his physical condition, that is, his progressive coronary disease or hypertension, has not.

26   In other words, Plaintiff does not suffer from a physical condition that renders him totally

27   disabled and precludes him from working.

28

1    In addition, the Ninth Circuit has recognized that words such as "mental impairment"

2    and "mental disorder" as used in Plan provisions may be ambiguous. For example in Kunin

3    v. Benefit Trust Life Insurance Company, 910 F.2d 534, 541 (9th Cir. 1990), the Plan

4    contained no definition or explanation of the term "mental impairment" and offered no

5    illustration of the conditions that are included or excluded. In Patterson v. Hughes Aircraft

6    Co., 11 F.3d 948 (9th Cir. 1993), the Ninth Circuit found the undefined Plan term "mental

7    disorder" ambiguous in two ways: (1) the Plain did not specify whether a disability is to be

8    classified as "mental by looking to the cause of the disability or to its symptoms"; (2) the

9    Plan did not make clear whether a disability qualified as a "mental disorder" when it results

10    from a combination of physical or mental factors.  Id., at 950.  To the extent that a Plan term

11    is ambiguous, it must be construed against the Plan and in favor of the insured.  Lang v.

12    Long-Term Disability Plan of Sponsor Applied Remote Technology, Inc., 125 F.3d 794, 799

13    (9th Cir. 1997).  In this case, the Plan defines "mental illness" as a "mental, emotional or

14    nervous condition of any kind".

15    Plaintiff and Defendants each have argued that the undisputed facts support entry of

16    summary judgment in that party's favor. Based on the contradicting medical opinions as to

17    Plaintiff's condition and alleged disability, there are genuine issues of material so as to

18    preclude summary judgment. The parties' cross-motions for summary judgment are denied.

19    "To evaluate Plaintiff's claim, the Court must conduct a bench trial based on the

20    administrative record and such other evidence as the Court admits." Sabatino v. Liberty Life

21    Assurance Company of Boston, 286 F. Supp. 2d 1222, 1229 (N.D.Cal. 2003)(citing Kearney

22    v. Standard Ins. Co., 175 F.3d 1084, 1094-95 (9th Cir. 1999))   In a trial on the record in an

23    ERISA case, "the judge can evaluate the persuasiveness of conflicting testimony and decide

24    which is more likely true." Kearney, 175 F.3d at 1094.  The trial court "consider[s] anew

25    both the legal and factual aspects of [the plaintiff's] claim." Thomas v. Oregon Fruit Products

26    Co., 228 F.3d 991, 995 (9th Cir. 2000).

27    "A district court, when exercising de novo review of an ERISA benefits denial

28    decision, may admit additional evidence when 'circumstances clearly establish that additional

1    evidence is necessary to conduct an adequate de novo review of the benefit decision.'"

2    Friedrich v. Intel Corp., 181 F.3d 1105, 1111 (9th Cir. 1999)(quoting Mongeluzo v. Baxter

3    Travenol Long Term Disability Benefit Plan, 46 F.3d 938, 944 (9th Cir. 1995)). The Court

4    has determined that additional evidence is necessary to conduct an adequate de novo review.

5    The additional evidence that will be considered by the Court is the testimony of Defendants'

6    officials and employees that if the claimant is disabled by both mental and physical

7    conditions, though neither alone is disabling, benefits are payable beyond the 24-month

8    period as stated in the Plan for "mental illness."

9           The Court will expedite trial of this matter on the administrative record. Defendants

10   shall file the entire administrative record by April 17, 2006.  The parties shall file proposed

11   findings of fact and conclusions of law by May 5, 2006.  The Court will hold a status hearing

12   to discuss the need for further proceedings in this case.

13          **Accordingly,**

14          **IT IS ORDERED** that Plaintiff's motion for summary judgment (Doc. 61) is denied.

15          **IT IS FURTHER ORDERED** that Defendants' cross-motion for summary judgment

16   (Doc. 60) is denied.

17          **IT IS FURTHER ORDERED** that Defendants shall file the entire administrative

18   record by April 17, 2006.

19          **IT IS FURTHER ORDERED** that the parties shall file proposed findings of fact and

20   conclusions of law by May 5, 2006.

21          DATED this 31st of March, 2006.

22

23

24   _____
                   Mary H. Murguia
                   United States District Judge

25

26

27

28

- 21 -