**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Mark J. Schwartz, | ) | No. CIV-01-2075-PHX-MHM |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| Metropolitan Life Insurance Company, a | ) | |
| New York corporation; American Express | ) | |
| Long Term Disability (LTD) Benefit Plan, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff has asserted a claim for disability benefits under an employee welfare benefit plan governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq.  Defendants are Metropolitan Life Insurance Company ("MetLife") and American Express Long Term Disability Benefit Plan.  This case is before the Court following remand from the Court of Appeals for the Ninth Circuit.  The Ninth Circuit reversed and remanded with instructions to apply a de novo standard of review.  (Doc. 53).  The Court previously considered this case on the parties' cross-motions for summary judgment.  The Court issued an Order denying the cross-motions for summary judgment and indicating that trial on the administrative record was appropriate.  (Doc. 68).

1    The parties have submitted proposed findings of fact and conclusions of law.  (Doc.

2   74 & 75).  The Court has considered the parties' submissions and reviewed the administrative

3   record (Doc. 73) and now issues its findings of fact and conclusions of law. Fed.R.Civ.P.

4   52(a).  See, Kearney v. Standard Ins. Co., 175 F.3d 1084, 1095 (9th Cir. 1999).

5                                                  **I.**

6                                        **Findings of Fact**.

7        A.  Relevant Plan Provisions.

8        Plaintiff was a participant in the American Express Employee Benefits Plan (the

9   "Plan") which provided long-term disability ("LTD") coverage through a group disability

10   insurance policy purchased from MetLife.  The Plan is governed by ERISA.  Pursuant to the

11   terms of the Plan, a person who is enrolled in the LTD Benefit Plan and who has been totally

12   disabled and prevented from working for six consecutive months is eligible to apply for

13   monthly LTD benefits following that six-month period.

14        The Plan provides "own occupation" coverage for the first 24 months that benefits are

15   payable and states in part as follows:

16            You are considered totally disabled and eligible to apply for
             LTD Benefit Plan benefits if, during the six-month waiting
17            period and the first two years that benefits are payable, you are
             unable to perform any and every duty of your own occupation
18            due to a medically determined physical or mental impairment
             caused by sickness, disease, injury or pregnancy.  You must
19            require the regular care and attendance of a doctor.

20   After the first two years, coverage is provided under the "any occupation" standard and the

21   Plan provision relevant to this coverage provides as follows:

22            To receive benefits after the first two years that benefits are
             payable, you must be under the care and attendance of a licensed
23            physician and your disability must prevent you from engaging
             in each of the material duties of any gainful work or service for
24            which you are reasonably qualified, taking into consideration
             your training, education, experience and past earnings (except
25            rehabilitative employment).

26        The Plan provides that if a person becomes totally disabled before age 60, benefits

27   will continue as long as the person is totally disabled, up to age 65 "(unless [the person] [is]

28

disabled due to mental illness, as defined ...") in another section of the Plan. The Plan provides limited coverage for disability due to mental illness as follows:

> If you are disabled due to mental illness, benefits are limited to 24 months if treatment is rendered on an outpatient basis ... If you do not return to work at the end of the 24-month period ... your LTD coverage will end. Mental illness is defined as a mental, emotional or nervous condition of any kind.

The Plan's provisions set forth the procedures for filing claims and review of claims for benefits, including an appeal if a claim is denied.  In addition, "[T]he plan administrator has the exclusive right to interpret the provisions of the plan and its decision is final, conclusive and binding (except as otherwise provided in the plan or by law)."  With respect to proof of any claim, the Plan provides:

> The claims administrator reserves the right to require verification of any alleged fact or assertion pertaining to any claim for benefits.  For example, as part of the basis for determining health care benefits, the claims administrator may require submission of medical summaries, discharge reports, X-rays or other appropriate materials.

Plaintiff has provided evidence, based on deposition testimony of Defendants' official Laura Sullivan, that if a disability involves a combination of physical and mental conditions, MetLife's initial assessment focuses on whether the person is disabled overall.  If the Plan contains a 24-month limitation for mental/nervous conditions, such as the Plan at issue in this case, MetLife continues to investigate to determine whether both conditions are disabling or the nature of the actual cause of the condition.  Ms. Sullivan further testified that if the claimant is disabled by both mental and physical conditions, though neither alone is disabling, benefits are payable beyond the 24-month period as stated in the Plan for "mental illness."  Plaintiff further has provided information through the testimony of MetLife's employees and officials that MetLife's case managers and appeal specialists do not have any medical training except in general medical terminology.

B.    Plaintiff's Condition and Application for Benefits.

Plaintiff is an accountant with a history of hypertension (high blood pressure), high cholesterol, and coronary artery disease ("CAD").  On January 30, 1999, at the age of 51,

1   Plaintiff underwent four-vessel coronary artery bypass surgery.  On February 17, 1999, Dr.

2   Andrei Damian, Plaintiff's cardiologist, noted that Plaintiff had done "well" regarding his

3   surgery  and was discharged with an "excellent post surgical recovery."  Dr. Damian noted

4   that stress and anxiety experienced at work had contributed to Plaintiff's cardiac condition

5   and he was initially scheduled to return to work on a part-time "trial" basis. Dr. Damian also

6   referred Plaintiff to a hospital-based cardiac rehabilitation program.  It was noted in this

7   rehabilitation plan that Plaintiff has a family history of early onset heart problems.  The plan

8   focused on stress reduction as a rehabilitation goal.

9       On March 11, 1999, Plaintiff's internist, Dr. Jack Poles, noted that Plaintiff's blood

10   pressure and general examination were "unremarkable."  A treadmill stress test on March 17,

11   1999, had  "normal results", with no subjective or objective evidence of coronary artery

12   disease, no arrhythmias and excellent exercise capacity.

13       However, shortly after surgery, Plaintiff began to experience exaggerated

14   psychological anxiety. On April 14, 1999, Plaintiff had his first appointment with Dr. David

15   Boyer, a psychiatrist, who diagnosed him as suffering from "post bypass anxiety syndrome."

16   Plaintiff was released to return to work based on his physical recovery and returned to work

17   part-time on April 15, 1999. In a Rehabilitation Services Report dated April 15, 1999,

18   Plaintiff's physical therapist indicated that Plaintiff has said that stress was a contributing

19   factor.

20       On June 14, 1999, a nurse's note indicated that Plaintiff had reported that his blood

21   pressure had become elevated and fluctuated and he experienced dizziness, palpitations, chest

22   pain and fatigue.

23       On June 16, 1999, Dr. Poles reported that Plaintiff had been having a difficult time

24   with returning to work and that he lacked energy.  Dr. Poles determined that Plaintiff needed

25   to be on total disability.  Plaintiff ceased working permanently on June 16, 1999.  On June

26   17, 1999, Dr. Poles wrote in a letter to Dr. Damian that Plaintiff's EKG was "unremarkable"

27   and that he suspected Plaintiff's condition was "more stress related." Dr. Poles noted that

28   Plaintiff's blood pressure was high. Dr. Poles recommended "total disability", reporting to

1  Plaintiff's employer that Plaintiff was unable to perform his job and that this condition would

2  continue "indefinitely."

3        On June 18, 1999, Dr. Damian's progress note indicated that Plaintiff was

4  "struggling" with anxiety and depression.  Dr. Damian stated that he believed that "part of

5  his symptoms are related to intermittent hypertension up to 150/102." In June 1999,

6  Plaintiff's Holter Monitor results (a 24-hour test that monitored Plaintiff's heart rate)

7  revealed underlying sinus rhythm with normal heart rate variability.

8        On June 25, 1999, Dr. Damian wrote to Dr. Poles that with medical management

9  Plaintiff's blood pressure had remained down.  However, Dr. Damian noted "documented

10  clear evidence of hypertension and a blood pressure of 151/102."  Dr. Damian expressed

11  concern about the development of Plaintiff's post bypass graft depression and anxiety, noting

12  that Plaintiff was currently undergoing psychotherapy.  Dr. Damian did not believe Plaintiff

13  could return to work.  A 24-hour Holter monitor had not revealed any evidence of malignant

14  dysrhythmia.  On June 30, 1999, Dr. Damian reported to Plaintiff's employer that Plaintiff

15  suffered from depression, stress intolerance and labile hypertension related to anxiety, and

16  that he was unable to interact effectively with clients.

17        On July 15, 1999, Plaintiff's Nuclear Stress Test revealed an EKG portion with

18  excellent exercise capacity and heart rate attainment.  There was no suggestion of ischemia

19  and the gated wall motion analysis revealed normal left ventricular function. On July 27,

20  1999, Dr. Damian reported that Plaintiff had excellent exercise capacity and documented an

21  excellent anatomical recovery but that stress and related symptoms including post bypass

22  anxiety prevented him from returning to routine employment.  On September 16, 1999, Dr.

23  Poles reported that Plaintiff's symptoms seemed under control because he was not working

24  and that his physicians had concluded that he could not again work in his usual capacity

25  because of his reaction to job stress.

26        On October 13, 1999, Plaintiff complained to Dr. Damian of nonspecific chest

27  discomfort that did not appear cardiac in description.  Dr. Damian reported an abnormal

28  finding that Plaintiff's blood pressure was 180/120; however, there was no evidence of

1   congestive heart failure or cardiac gallop.  It was noted that Plaintiff was unable to deal

2   appropriately with stressful situations without putting himself at risk.  On this same date, Dr.

3   Damian reported to the Social Security Administration that Plaintiff had "wonderful

4   improvement" following his heart treatment but he did not believe that Plaintiff could return

5   to a gainful employment, noting that Plaintiff is "affected negatively by any interaction with

6   humanity, stress, or responsible work and accountability which will only compromise his life

7   span." Dr. Damian wrote that Plaintiff had "developed significant anxiety post bypass

8   surgery which is consistent with post bypass stress and anxiety syndrome which appears

9   exacerbated continually with the severe presence of hypertension."

10  On October 14, 1999, MetLife wrote Plaintiff advising that he might be eligible for

11  LTD benefits and requested completion of a number of forms which were enclosed. On

12  October 25, 1999, Plaintiff completed a Statement of Claim requesting LTD benefits under

13  the Policy.

14  On October 29, 1999, Dr. Poles reported that Plaintiff "clearly cannot perform at work

15  due to severe anxiety ..." On October 31, 1999, Dr. Poles completed an Attending Physician

16  Statement and Physical Capacities Evaluation for MetLife, stating that Plaintiff suffered from

17  coronary disease, anxiety, chest pain, sweats and palpitations. Dr. Poles indicated that

18  Plaintiff's "problems are anxiety related not due to physical limitations. ..."

19  Dr. Boyer's November 13, 1999 Attending Physician Statement stated that Plaintiff's

20  psychological functions were at a Class 3-4 (marked limitation) due to "emotional factors

21  affecting a medical condition-anxiety and depression" and "obsessive compulsive personality

22  disorder."  Dr. Boyer stated that Plaintiff's acute anxiety and depression were expected to

23  abate, but not his underlying psychophysiologic vulnerability,  e.g., significant blood

24  pressure increases under stress. Dr. Damian's November 17, 1999 Attending Physician

25  Statement stated that Plaintiff's Psychological Functions were a Class 4 (marked limitations),

26  but that his Cardiac Functions were only a Class 2 (slight limitations).  Dr. Damian stated

27  that Plaintiff suffered from severe post bypass anxiety syndrome and hypertension and he

28

1   was unable to engage in gainful activity. On November 22, 1999, MetLife wrote to Dr.
2   Damian requesting Plaintiff's medical records.

3        On December 5-7, 1999, Plaintiff was self-admitted to the hospital for chest pain but
4   no cardiac problem was found.  Hospital records noted a "status of post bypass graft surgery
5   with significant symptoms mostly related to post stress anxiety and evidence of hypertension
6   which remain[ed] out of control until most recently when [Plaintiff] was placed on
7   continuous beta blockade."  A treadmill Cardiolite documented excellent exercise capacity.
8   Dr. Damian's office visit  note for December 27, 1999 stated that control of Plaintiff's blood
9   pressure had been achieved and Plaintiff did not appear to be under significant stress at that
10  time.

11       In a January 12, 2000 letter, Dr. Damian responded to Provident Insurance Company
12  regarding an Independent Medical Exam performed by Dr. Michael Greer. Dr. Damian's
13  response stated that "[w]hile the objective stress treadmill data suggest an adequate surgical
14  result and presumes no limitations preventing a return to work ....In my opinion it is clear that
15  Mr. Schwartz's disability at this point is caused by his post bypass anxiety syndrome and
16  secondary intermittent uncontrolled hypertension which is acutely exacerbated by his attempt
17  to return to work..."  On January 22, 2001, Plaintiff received a Social Security total disability
18  award commencing July 1999 with primary diagnosis of "anxiety related disorder" and
19  secondary diagnosis of "personality disorder."

20       MetLife had Plaintiff's file reviewed by Dr. Jay Lasser, its consulting psychiatrist.
21  Dr. Lasser noted that Plaintiff wanted to return to work but his perfectionist tendencies and
22  entrenched personality issues were unlikely amenable to much change. Dr. Lasser
23  recommended that Plaintiff's file be reviewed by a consultant with expertise in cardiology.
24  It does not appear that MetLife had a cardiologist review Plaintiff's file.

25       On February 17, 2000, a MetLife official reviewed Plaintiff's claim as a high liability
26  claim. The information on the review form indicated that Plaintiff's diagnosis was
27  "cardiovascular disease, anxiety, depression" and stated that "because of significant anxiety
28

1    disorder and personality components it is highly unlikely [Plaintiff] will improve enough to
2    return to any occupation."

3         On February 25, 2000, MetLife informed Plaintiff that his LTD claim had been
4    approved as a mental/nervous condition starting July 29, 1999 (the end of the six-month
5    elimination period) and that he was eligible to receive Plan benefits for 24 months, through
6    July 29, 2001, if he remained disabled.  Plaintiff was re-notified of this information on April
7    28, 2000 and May 15, 2000. On February 28, 2000, MetLife requested all of Plaintiff's
8    medical records from Dr. Damian.

9         On March 22, 2000, Dr. Damian wrote Dr. Poles that Plaintiff had recently blacked
10   out and he possibly was experiencing orthostatic changes. Dr. Damian recommended concern
11   over possible transitory bradycardia or a heart block. Dr. Damian was not concerned with
12   hypertension at the present time.  On March 29, 2000, Dr. Damian wrote Dr. Poles that a 24
13   hour Holter monitor documented a sinus rhythm with a first degree AV block and absence
14   of any significant periods of bradyarrhythmias. A change in medication had resulted in
15   Plaintiff's improved condition, noting that he was essentially asymptomatic.

16        Dr. Poles' Attending Physician Statement dated May 28, 2000 stated that Plaintiff had
17   "anxiety related symptoms not physically impaired." Plaintiff's diagnoses were listed as
18   including coronary disease, hypertension, anxiety at work, chest pain, sweats, and
19   palpitations.  Dr. Poles noted that Plaintiff could not deal with stressful situations. Dr.
20   Damian's May 31, 2000 Attending Physician Statement discussed Plaintiff's coronary artery
21   disease, hypertension and inability to engage in stress situations or interpersonal
22   relationships. Dr. Boyer completed an Attending Physician Statement and supplemental
23   questionnaire on June 1, 2000 which indicated that Plaintiff "is unable to cope with the stress
24   of his career" and that he is unable to return to work.

25        On June 10, 2000, Plaintiff completed an Activities of Daily Living form in which he
26   stated that stressful situations caused an increase in his blood pressure and that he had trouble
27   concentrating.  Plaintiff stated he had had to scale back his volunteer work.

28

In June 2000,  Dr. Damian wrote that Plaintiff's blood pressure was well controlled "in the absence of any active excitement." Dr. Boyer noted that Plaintiff had increased blood pressure as a result of an incident when he misplaced his volunteer badge at the hospital.  In September 2000, Dr. Damian reported that even with minimal stress and anxiety, Plaintiff was experiencing significant hypertension, and that a recent discussion concerning his financial circumstances caused his blood pressure to become elevated.

On November 1, 2000, Dr. Poles reported that Plaintiff is "doing well from the cardiovascular point of view except that he gets occasional stress-induced chest pain which [Plaintiff] does not think is cardiac." Dr. Poles stated that Plaintiff suffered from chest pain, difficulty breathing, and hypertension when under stress due to such things as financial concerns.

On November 2, 2000, Plaintiff was admitted to the hospital for chest pain. Examination revealed no active disease in the chest. A stress test revealed excellent functional capacity, mild hypertensive response to exercise, and normal ST segment response to exercise. A cardiac ultrasound revealed trivial mitral and tricuspid regurgitation and an otherwise unremarkable 2-d, M-mode and Doppler examination.

Dr. Damian's December 10, 2000 chart note stated that Plaintiff's catheterization revealed that his disease had progressed to the point of "total occlusion of the LAD [left anterior descending artery] with no flow via the graft in that distribution." On January 11, 2001, Dr. Damian wrote Dr. Poles that Plaintiff had "evidence of progression of cardiac disease with angina induced by stress and anxiety and difficulty in documenting objectively the presence of active cardiac disease with a treadmill stress test."

On January 11, 2001, MetLife notified Plaintiff that benefits under the mental/nervous provision would be paid to July 29, 2001. MetLife requested any information that supported a physical condition that would prevent Plaintiff from working at any occupation.

Plaintiff provided MetLife with Dr. Damian's letter dated January 22, 2001 stating that Plaintiff had "developed symptoms of exertional angina and chest discomfort associated with hypertension" which was mostly associated "with periods of anxiety, stress and anger related

to his communications with the insurance company regarding his disability policy." Dr. Damian wrote that "[i]t is clear that any work related interaction, stress, or anxiety does cause [Plaintiff] profound symptoms and elevated blood pressure which are known to cause plaque rupture, vasoconstriction, and progression of disease." Dr. Damian indicated that a recent catheterization had documented the progression of aggressive cardiac disease as described in the letter. Dr. Damian expressed the opinion that Plaintiff was at "a very high risk" for progression of disease and he should be on total disability while attempting to control such progression.

In a February 20, 2001 office note, Dr. Damian reported that Plaintiff had some "atypical episodes of chest pain which are probably musculoskeletal ... without any evidence of congestive heart failure."

Plaintiff's pre-termination of benefits appeal was received by MetLife on February 26, 2001. In March 2001, MetLife requested additional information/medical records from Dr. Damian and from two of Plaintiff's medical providers.

On March 20, 2001, Dr. Damian reported that Plaintiff had presented with atypical chest pain, mostly on the right side associated with stress and anxiety related to his father's illness. Dr. Damian did not believe that Plaintiff was exhibiting the presence of new progressive coronary artery disease. On March 29, 2001 Plaintiff underwent a Nuclear Stress Test at Dr. Damian's office. The test revealed normal cardiac function and excellent exercise capacity. Dr. Damian's April 2, 2001 office visit note reported that the 24-hour Holter monitor test was unremarkable, with excellent exercise capacity and absence of myocardial ischemia. On April 9, 2001, Dr. Damian wrote Dr. Poles that Plaintiff continues to have atypical but persistent chest discomfort and that there was evidence of residual LAD disease. Dr. Damian recommended a PTCA/stent. On April 19, 2001, Plaintiff underwent an angioplasty and stent surgery.

On April 12, 2001, MetLife referred Plaintiff's medical records for a Physician Consultant Review by Amy Hopkins, M.D., MPH, Ph.D. (Board Certified in Internal Medicine and Occupational Medicine, Fellow of the American College of Occupational and

1   Environmental Medicine).  Dr. Hopkins reviewed the medical records of Drs. Poles, Damian

2   and Boyer.   Dr. Hopkins expressed the opinion that Plaintiff had developed a host of

3   psychological problems following his heart surgery in January 1999 but that his blood

4   pressure recordings since early 2000 had been within normal limits.  Plaintiff's cholesterol

5   and two stress tests also were within normal limits.  However, a recent cardiac [catheter] had

6   shown progression of disease "which is to be expected."  Dr. Hopkins noted that Plaintiff has

7   had atypical chest pain which has not been documented to be of cardiac origin and that

8   Plaintiff's daily exercise included walking, swimming and golfing.  Dr. Hopkins also noted

9   that Dr. Poles does not feel that Plaintiff had significant limitation and that Plaintiff had not

10  worked since April 1999 so it could not be presumed that working per se would increase his

11  blood pressure.  Dr. Hopkins found no documented indication of a "cause and effect"

12  relationship between Plaintiff's working and elevated blood pressure, noting that Plaintiff's

13  blood pressure had been well controlled since starting a beta blocker and he had not

14  attempted work since starting his current medication regimen.

15        Dr. Hopkins mentioned that Plaintiff's stress at work increased his cholesterol but "no

16  such relationship between stress and cholesterol levels has been documented in the medical

17  literature" and that "stress does not cause, exacerbate, or accelerate [coronary artery

18  disease]."  Dr. Hopkins noted that Plaintiff had held leadership  and committee roles in

19  various organizations, performed volunteer work and functioned adequately outside the

20  home. Dr. Poles also had recommended that Plaintiff was capable of performing at a medium

21  work capacity physically. Dr. Hopkins' final recommendation was that no physical

22  impairments had been documented which preluded Plaintiff from returning to work full time

23  as to any occupation up to and including medium work capacity.

24        On April 19, 2001, MetLife wrote Drs. Poles and Damian advising that Plaintiff was

25  being paid LTD benefits under a mental/nervous contractual provision which expired on July

26  29, 2001. MetLife included Dr. Hopkins' findings and stated that Drs. Poles and Damian

27  were being afforded an opportunity to comment.

28

1    On April 23, 2001, Dr. Poles responded to MetLife regarding Dr. Hopkins'

2  evaluation.  Dr. Poles stated that, although Dr. Hopkins' evaluation of Plaintiff's physical

3  problems was correct, Plaintiff could not psychologically return to his previous occupation

4  and that attempts at doing so would precipitate chest pain, anxiety, and total dysfunctionality.

5  Dr. Poles stated that Plaintiff had residual disease in his left anterior descending artery of at

6  least 60 to 70 percent.

7    On May 10, 2001, Plaintiff advised MetLife that he had undergone an angioplasty and

8  stent surgery on April 19, 2001. During Plaintiff's May 15, 2001 office visit, Dr. Damian

9  noted that Plaintiff had had a stent/angioplasty and had "remained free of symptoms since

10  the procedure [had been] performed."

11    On July 9, 2001, Dr. Damian wrote to MetLife in response to Dr. Hopkins' review,

12  stating that he did not totally disagree with Dr. Poles who had indicated that Plaintiff was

13  capable of performing at a medium work capacity physically.  Dr. Damian stated that the

14  problem was not necessarily Plaintiff's physical condition but his mental condition and his

15  mental ability to deal with the requirements at work, stress, anxiety, and all in perspective

16  of what had occurred after his unexpected bypass surgery and progression of disease.  Dr.

17  Damian reported that Dr. Hopkins was incorrect in her assessment that "progression of

18  cardiac disease can be expected" after bypass surgery. Rather, in his opinion, progression is

19  generally not expected within the first year or two following bypass surgery in patients as

20  young as Plaintiff.  Dr. Damian noted that Plaintiff's chest pain had been documented to be

21  of cardiac origin because it had subsided after the angioplasty and stent replacement.

22    On July 18, 2001, MetLife advised Plaintiff that it had reaffirmed the determination

23  that his disability was a mental/nervous condition and that benefits would expire on July 29,

24  2001.  MetLife explained that Dr. Boyer had provided documentation which supported a

25  mental condition and therefore benefits had been paid on that condition.  The letter further

26  explained that Plaintiff's doctors and MetLife's independent physician consultant had

27  seemed to agree that while Plaintiff has a cardiac condition, it did not physically restrict or

28  limit Plaintiff's function as to preclude his ability to return to his former occupation or other

1  occupation up to a medium level of work capacity.  Plaintiff was advised of his appeal rights
2  in this letter.

3        On July 19, 2001, Plaintiff submitted a letter from Dr. Damian dated July 18, 2001 to
4  MetLife. Dr. Damian stated in this letter that, post bypass graft surgery, Plaintiff had been
5  documented to have progressive symptoms of depression and anxiety consistent with well-
6  established syndrome. Plaintiff's physical and emotional conditions were jointly contributing
7  to his progressive cardiac disease and inability to control Plaintiff's blood pressure had been
8  documented. Dr. Damian opined that Plaintiff was disabled from working in his own
9  profession or any other profession involving stressful conditions and that if Plaintiff
10 disregarded his doctors' recommendations not to work, he faced "reasonably certain untimely
11 demise."  Dr. Damian observed that anxiety and emotional stress had been documented in
12 the medical literature since 1994 as a trigger causing disruption of plaque and progressive
13 occlusive disease.  According to Dr. Damian, returning Plaintiff to his working environment
14 in his profession or any occupation involving stress would start a "cascade of uncontrolled
15 events that [would] culminate in uncontrolled hypertension as proven before, secondary and
16 related anxiety and significant disruption of the plaque with fatal outcome."

17       On July 20, 2001, Plaintiff requested another appeal and MetLife referred the claim
18 to Dr. Hopkins for review.  Dr. Hopkins conducted a second Physician Consultant Review
19 on August 2, 2001.  Dr. Hopkins found that Dr. Damian had not provided any additional
20 information substantiating that Plaintiff had a physical impairment that would prevent him
21 from working in any occupation. Dr. Damian further had indicated that the primary problem
22 was Plaintiff's psychological problems. Dr. Hopkins concluded that no physical impairments
23 had been documented that would preclude Plaintiff from returning to work full time in any
24 occupation up to and including a medium work capacity.

25       On August 3, 2001, Plaintiff's file was referred to MetLife's Appeals Department.
26 On September 12, 2001, Plaintiff's attorney provided additional medical records from
27 Plaintiff's primary doctors plus records related to Plaintiff's April 19, 2001 hospitalization
28 for angioplasty and stent surgery. The file and additional medical records were sent to Dr.

Hopkins for another review.  On September 28, 2001, Dr. Hopkins concluded that Plaintiff was not precluded by documented physical impairments from returning to work full time up to and including medium work capacity, stating as follows:

> [Plaintiff] has had atypical [chest pain] of long-standing duration, but it has not been documented to be of cardiac origin. He has not had any CHF [chronic heart failure], significant arrhythmias, or ongoing ischemia. [Plaintiff's] documented [blood pressures] in the additional information provided were all [within normal limits], so Dr. Damian's contention that [Plaintiff] has uncontrolled [hypertension] is simply not supported by his own records. It is not clear why he would be refuting his own [blood pressure] measurements.  While [Plaintiff] may have progressive [coronary artery disease], he does not have any [symptoms] referable to the cardiac system, and there is no documented cardiac reason why he cannot [return to work] in any occupation at up to a medium level work capacity, at least ... [Plaintiff] clearly had problems w/ stress and anxiety ... It is not clear why, if Dr. Damian feels that stress is such a potentially lethal problem in [Plaintiff's] life, he has not referred [Plaintiff] to some kind of stress management program.... The determination of impairment is based upon an individual's current condition, not on what might or might not potentially happen in future situations.  While [Plaintiff's] anxiety might be impairing him from certain kinds of work, that cannot be construed as implying that his cardiac condition would worsen if he returned to work ... No physical impairments have been documented which preclude [Plaintiff] from [return to work], [full time], any occupation, at up to and including a medium work capacity.

On October 10, 2001, MetLife wrote to Plaintiff's attorney explaining that the decision had been upheld on appeal.  MetLife stated that "[a]fter [Plaintiff's] bypass surgery, Dr. Damian and Dr. Boyer indicated that [Plaintiff] regained the physical capacity to perform sedentary work, but was disabled from his own occupation as a result of a mental health condition."  The reviewer concluded that Plaintiff was not physically disabled as of July 29, 2001 from performing sedentary-like duties of his own occupation and that there was no "objective information" in the record showing that "exposure to work stress represents a severe threat to [Plaintiff's] physical health."  The letter stated that "in determining disability, we base our decision on an individual's current functionality rather than what could potentially happen in the future."  On October 10, 2001, MetLife informed Plaintiff's

1   employer that review of Plaintiff's appeal had been completed and that the decision to

2   terminate benefits had been upheld.

3        Based on the deposition testimony of David Cohen, a MetLife claims/appeals

4   specialist, the policy at page 534 provided that to receive benefits after the first two years

5   benefits are payable, a claimant must be under the care of a licensed physician and the

6   disability must prevent the claimant from engaging in "each of the material duties of any

7   gainful work or service for which [the claimant] [is] reasonably qualified taking into

8   consideration [the claimant's] training, education, and experience, and past earnings, except

9   for rehabilitative employment."   This provision does not refer to the claimant's own

10  occupation.  The fact that a claimant cannot return to his own occupation is not a bar to the

11  application of the "any occupation" standard. (Cohen Deposition at pages 11-13).  In order

12  to investigate the application of this provision, MetLife would investigate and assess the

13  claimant's capabilities.  Based on the claimant's capabilities, a vocational determination

14  would be made to determine that jobs are available for the claimant to perform.  Mr. Cohen

15  testified that MetLife generally would consider a transferrable skills analysis and possibly

16  a labor market survey.  (id., at pages 14-15).  A vocational analysis was not performed on

17  Plaintiff's claim.  (id., at page 15).

18       Plaintiff was paid long term disability benefits for a period of twenty-four (24) months

19  from July 29, 1999 to July 29, 2001.  The net benefit amount claimed by Plaintiff in this case

20  is $11,422.33 per month, commencing July 29, 2001.

21                                          **II**.

22                          **Contentions of the Parties**.

23       Plaintiff contends that benefits were wrongfully terminated on July 29, 2001 based

24  on the following arguments: (1) the "mental illness" language of the type used in the Plan

25  cannot be applied to cases involving mental conditions resulting from physical disorders; (2)

26  he suffers from both aggressive coronary artery disease and maladaptive personality patterns

27  and therefore benefits are payable for a physical, not mental, disability; and, (3) the Plan's

28  disposition contravened its own interpretation that a claimant is not limited to 24 months of

benefits if he is disabled by a combination of mental and physical ailments which is the case here.  Plaintiff argues that in light of the undisputed documented evidence, he suffers from coronary artery disease and that he is disabled as a result of a rapidly deteriorating heart condition in conjunction with his physiologic reaction to job stress.

Defendants contend that based on the undisputed evidence provided by Plaintiff's treating physicians, but for Plaintiff's psychological conditions, i.e., bypass anxiety disorder, Plaintiff would not have any disabling symptoms. Defendants further contend that the evidence supported by the administrative record shows that Plaintiff has fully recovered from his heart surgery, he suffers from a psychological condition, and therefore MetLife's termination of benefits based on the mental/nervous limitation was proper.

### III.

### Conclusions of Law.

This Court has jurisdiction over this action pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq.

This Court's review of Defendants' decision to terminate benefits is de novo.   The district court, in applying the de novo standard of review, must review de novo the plan administrator's decision to deny benefits.  Tremain v. Bell Industries, Inc., 196 F.3d 970, 978 (9th Cir. 1999).

A district court performing de novo review of an ERISA benefits denial may consider evidence  outside the administrative record as necessary to conduct an adequate de novo review of the benefit decision. Friedrich v. Intel Corp., 181 F.3d 1105, 1111 (9th Cir. 1999)(quoting Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan, 46 F.3d 938, 944 (9th Cir. 1995)).

Federal courts apply federal common law when faced with questions of policy interpretation under ERISA.  Padfield v. AIG Life Ins. Co., 290 F.3d 1121, 1125 (9th Cir. 2002).  Under this federal common law, the terms of a plan are given their ordinary and popular meaning as would a person of average intelligence and experience.  Id.  A de novo

1  review "'gives no deference at all' to the decisions of insurers to deny benefits."  Kearney v.

2  Standard Ins. Co., 175 F.3d 1084, 1090 n.2 (9th Cir. 1999).

3       Plaintiff has the burden of proof to show that he was eligible for continued long term

4  disability benefits based on the terms and conditions of the ERISA plan.  See Sabatino v.

5  Liberty Life Assurance Co., 286 F. Supp. 2d 1222, 1232 (N.D. Cal. 2003).  In a trial on the

6  administrative record, the Court "can evaluate the persuasiveness of conflicting testimony

7  and decide which is more likely true."  Kearney, 175 F.3d at 1095.

8       In order to receive LTD benefits under the Plan, a claimant must be "unable to

9  perform any and every duty of [the claimant's] own occupation due to a medically determined

10  physical or mental impairment caused by sickness, disease, [or] injury ..."  The claimant also

11  must be under the regular care and attendance of a doctor.  The Plan further provides that if

12  a claimant is disabled due to "mental illness," benefits are limited to 24 months if treatment

13  is rendered on an outpatient basis.  The term "mental illness" is defined as "a mental,

14  emotional or nervous condition of any kind."  Evidence in the administrative record shows

15  that Plaintiff is under the regular care and attendance of his physicians following his coronary

16  artery bypass surgery in January 1999.  The parties do not dispute a finding on this issue in

17  their briefing.

18       Defendants' argument that the medical evidence of record establishes that Plaintiff

19  does not have a physical condition because he has fully recovered from his January 1999

20  heart surgery presents a narrow and constricted view of the evidence and of Plaintiff's

21  condition. The record medical evidence does contain several references to Plaintiff's exercise

22  capacity and instances of chest pain that did not appear to be cardiac of origin. However,

23  Defendants' characterization of the record medical evidence discounts the presence and

24  seriousness of Plaintiff's cardiac condition/progressive coronary disease and does not present

25  a full picture of Plaintiff's condition.

26       Plaintiff has a history of hypertension (high blood pressure), high cholesterol and

27  coronary artery disease. In January 1999, at age of 51, he underwent four-vessel coronary

28  artery bypass surgery. Although his prognosis for recovery was "excellent," it is undisputed

that shortly after surgery, Plaintiff began to experience exaggerated anxiety resulting in a subsequent diagnosis of "post bypass anxiety syndrome" in April 1999 by Dr. Boyer, a psychiatrist.   Between April and June 1999, Plaintiff attempted to work at his own occupation of accountant but it appears that stress related to his job was contributing to his condition. In June, 1999, Plaintiff's cardiologist Dr. Damian expressed the opinion that "part" of Plaintiff's symptoms were related to intermittent hypertension.  Plaintiff's hypertension was documented about this same time.  In June 1999, Dr. Poles, Plaintiff's internist, noted Plaintiff's high blood pressure and determined that Plaintiff needed to be on total disability. In October 1999, Dr. Damian wrote that Plaintiff had "developed significant anxiety post bypass surgery" which was consistent with post bypass stress and anxiety syndrome "exacerbated continually with the severe presence of hypertension."  In November 1999, Dr. Damian reported to MetLife that Plaintiff had slight limitations regarding his cardiac functions, marked limitations with his psychological functions and that he suffered from post-bypass anxiety syndrome and hypertension.  Dr. Damian expressed the opinion that Plaintiff was unable to engage in gainful activity.  About this same time, Dr. Boyer expressed the opinion that Plaintiff's acute anxiety and depression might abate but not his underlying psychophysiologic vulnerability, that is, significant blood pressure increases when under stress due to his cardiovascular condition.

On February 17, 2000, a MetLife official reviewed Plaintiff's file and noted Plaintiff's "cardiovascular disease, anxiety, and depression."  In March 2000, Dr. Damian expressed concern about Plaintiff regarding a possible heart block.  During 2000, Plaintiff's treating physicians noted Plaintiff's diagnoses as including coronary disease, hypertension, anxiety at work, chest pain, etc.  In September 2000, Dr. Damian noted that even with minimal stress and anxiety, Plaintiff was experiencing significant hypertension.

In December 2000, Plaintiff's catheterization revealed that his coronary artery disease/heart condition had progressed to the point of "total occlusion of the [left anterior descending artery] with no flow via the graft in that distribution."  Dr. Damian's January 2001 letter to Dr. Poles reported that Plaintiff had "evidence of progression of cardiac disease

1   with angina induced by stress and anxiety."  On January 22, 2001, Dr. Damian wrote that

2   Plaintiff had developed symptoms of exertional angina and chest discomfort associated with

3   hypertension which was mostly associated with periods of anxiety, stress and anger.  Dr.

4   Damian also wrote  that Plaintiff was at a "very high risk" for progression of disease. In April

5   2001, Plaintiff underwent an angioplasty and stent surgery.  In July 2001, Dr. Damian

6   advised MetLife that Plaintiff's progressive cardiac disease was not expected.  He also stated

7   that Plaintiff's chest pain had been documented to be of cardiac origin because it had

8   subsided after the April 2001 stent surgery.  According to Dr. Damian, Plaintiff's progression

9   of cardiac disease with angina induced by stress and anxiety had been difficult to detect with

10  a treadmill stress test.

11          The record contains numerous opinions and recommendations from Plaintiff's treating

12  physicians that Plaintiff was unable to return to his own occupation or any profession and

13  was totally disabled.  In June and November 1999, Dr. Damian recommended Plaintiff's total

14  disability. In January 2001, Dr. Damian recommended to MetLife that Plaintiff's should be

15  on total disability while attempting to control the progression of his disease.  In April 2001,

16  Dr. Poles wrote to MetLife that Plaintiff could not psychologically return to his previous

17  occupation and that attempts at doing so would precipitate chest pain, anxiety and total

18  dysfunctionality.  Dr. Poles noted that Plaintiff had residual disease in his left anterior

19  descending artery of at least 60 to 70 percent.  In a letter dated July 2001, Dr. Damian wrote

20  to MetLife that Plaintiff had physical and emotional conditions that jointly were contributing

21  to his progressive cardiac disease, again noting inability to control Plaintiff's hypertension.

22  Dr. Damian opined that Plaintiff was disabled from working in his own profession or any

23  other profession involving stressful conditions and that Plaintiff's return to work would

24  endanger his health.  While nothing in ERISA suggests that a plan administrator must accord

25  special deference to the opinions of treating physicians, Black & Decker Disability Plan v.

26  Nord, 538 U.S. 822, 834, 123 S.Ct. 1965 (2003), a claimant's reliable evidence, including the

27  opinions of a treating physician, may not be arbitrarily discredited. Id.  In the context of

28  insurance law, "'[t]he insured is considered to be ... disabled where it is impossible for him

1    to work without hazarding his health or risking his life.'" <u>Lasser v. Reliance Standard Life</u>

2    <u>Insurance Co.</u>, 146 F. Supp. 2d 619, 628 (D.N.J. 2001)(quoting 1C <u>Appleman Insurance Law</u>

3    <u>& Practice</u> § 651 at 241 (1981)), <u>aff'd</u>, 344 F.3d 381 (3d Cir. 2003).  The evidence in the

4    administrative record supports the conclusion on this Court's de novo review that Plaintiff

5    suffers from progressive coronary artery disease, hypertension, post bypass anxiety syndrome

6    and maladaptive personality patterns and that his physicians have determined that he is

7    disabled.

8         Based on the Court's review of the entire administrative record, it cannot be concluded

9    that Plaintiff has successfully recovered from his heart surgery or progressive cardiac

10   condition. Defendants' claim to this effect is not supported by a reasonable interpretation of

11   all of the medical evidence of record.  As previously discussed, in December 2000 and

12   January 2001, Plaintiff's physician noted progression of cardiac disease.  In April 2001,

13   Plaintiff underwent an angioplasty and stent surgery.  In July 2001, Dr. Damian advised

14   MetLife that Plaintiff's progressive cardiac disease was not expected and had been difficult

15   to detect. MetLife acknowledged Plaintiff's cardiac condition in its July 18, 2001

16   determination explanation. Dr. Hopkins in her September 2001 evaluation recognized that

17   Plaintiff "may have" progressive coronary artery disease. The administrative record evidence

18   does not support the conclusion that Plaintiff is disabled due only to "mental illness" which

19   is defined as a "mental, emotional or nervous condition of any kind." <u>See</u>, <u>e.g.</u>, <u>Mongeluzo</u>,

20   46 F.3d at 943 ("if either a cause or a symptom of the disease were physical and caused the

21   disability in whole or in part, then benefits are payable").

22        The Court also has considered Plaintiff's argument that he suffers from a combination

23   of impairments. The Court has considered the deposition testimony of Defendants' employees

24   David Cohen and Laura Sullivan. The Court has considered this evidence as necessary to

25   conduct an adequate de novo review of the benefit decision. <u>Friedrich v. Intel Corp.</u>, 181

26   F.3d 1105, 1111 (9th Cir. 1999)(quoting <u>Mongeluzo v. Baxter Travenol Long Term Disability</u>

27   <u>Benefit Plan</u>, 46 F.3d 938, 944 (9th Cir. 1995)).  Based on Defendants' own interpretation of

28   the Plan, if a claimant is disabled by both mental and physical conditions, though neither

1   alone is disabling, benefits are payable beyond the 24-month period as stated in the Plan for

2   "mental illness."  A disability caused by a combination of physical and mental impairments

3   is not subject to the Plan's mental illness limitation. There is substantial medical evidence

4   which supports the conclusion that Plaintiff suffers from a combination of impairments, that

5   is, aggressive coronary artery disease, hypertension, post bypass anxiety syndrome and a type

6   of personality disorder. Plaintiff's medically documented disability based on a combination

7   of physical and mental impairments warrants the payment of benefits beyond the 24-month

8   period.

9       Alternatively, the Court has considered whether the terms of the Plan regarding

10   "mental illness"  and "mental, emotional or nervous condition" are ambiguous. The Ninth

11   Circuit has recognized that words such as "mental impairment" and "mental disorder" as used

12   in Plan provisions may be ambiguous. For example in <u>Kunin v. Benefit Trust Life Insurance</u>

13   <u>Company</u>, 910 F.2d 534, 541 (9th Cir. 1990), the Plan contained no definition or explanation

14   of the term "mental impairment" and offered no illustration of the conditions that are

15   included or excluded. In <u>Patterson v. Hughes Aircraft Co.</u>, 11 F.3d 948 (9th Cir. 1993), the

16   Ninth Circuit found the undefined Plan term "mental disorder" ambiguous in two ways: (1)

17   the Plain did not specify whether a disability is to be classified as "mental by looking to the

18   cause of the disability or to its symptoms"; (2) the Plan did not make clear whether a

19   disability qualified as a "mental disorder" when it results from a combination of physical or

20   mental factors.  <u>Id.</u>, at 950.  To the extent that a Plan term is ambiguous, it must be construed

21   against the Plan and in favor of the insured.  <u>Lang v. Long-Term Disability Plan of Sponsor</u>

22   <u>Applied Remote Technology, Inc.</u>, 125 F.3d 794, 799 (9th Cir. 1997).

23       The Plan defines "mental illness" as a "mental, emotional or nervous condition of any

24   kind."  This definition is imprecise.  It is not clear whether the Plan limits benefits based

25   solely on mental conditions or whether it encompasses long-term disabilities resulting from

26   a combination of physical and mental impairments. The Plan does not specify whether a

27   condition classified as "mental" is determined by looking to the cause or to the symptoms.

28   The Plan's terms therefore appear ambiguous as applied to Plaintiff's claim and must be

construed against Defendants and in favor of the Plaintiff on the issue of reinstatement of benefits.

## IV.

## Conclusion.

Based on the file, administrative record and proceedings herein, Plaintiff's condition is not solely due to a mental disorder limiting the payment of benefits.  Defendants contend that this matter should be remanded to the Claim Administrator for a determination of whether Plaintiff was totally disabled as of July 29, 2001 from "any job" for which he was qualified by training, education and experience. (Doc. page 18, n. 3).  The Court disagrees.

Plaintiff is entitled to receive long-term disability benefits under the Plan reinstated as of July 29, 2001 to the date of Judgment. Defendants may not avoid liability for past benefits by arguing that Plaintiff was not disabled for all or part of the period.  The administrative record indicates that Dr. Hopkins recommended in her evaluation assessments that no physical impairments had been documented which precluded Plaintiff from returning to work full time as to any occupation up to and including a medium work capacity.  This recommended conclusion was made even though there had been no vocational assessment relevant to Plaintiff.  Defendants' erroneous interpretation of the Plan and of the medical evidence is responsible for the present situation.  Payment of benefits to the date of Judgment is appropriate because Defendants' obligation to pay future benefits is dependent on Plaintiff's continued disability.  A requirement that Plaintiff obtain a prompt medical examination to determine continued eligibility is not unreasonable.  Plaintiff may file a motion seeking costs and attorney's fees in accordance with applicable authority, including statutes and rules, as appropriate, and  LRCiv. 54.1 and 54.2, Rules of Practice Civil, District of Arizona.

**Accordingly,**

**IT IS ORDERED** that the Court finds in favor of Plaintiff and against Defendants on Plaintiff's claim for ERISA benefits.

**IT IS FURTHER ORDERED** that Defendants shall pay to Plaintiff long term disability benefits in the amount of $11,422.33 per month, plus interest as appropriate, under the terms of the Plan commencing July 29, 2001 up to and through the date of Judgment.

**IT IS FURTHER ORDERED** that Judgment shall be entered in favor of Plaintiff on his claim for ERISA benefits and against Defendants.

**IT IS FURTHER ORDERED** that Plaintiff may file a motion seeking costs and attorney's fees in accordance with applicable authority, including statutes and rules, as appropriate, and LRCiv. 54.1 and 54.2, Rules of Practice Civil, District of Arizona.

DATED this 29th day of September, 2006.

Mary H. Murgula
United States District Judge